No. 123,710

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Parentage of E.A.,
a Minor Child.

SYLLABUS BY THE COURT

1.

The Kansas Parentage Act focuses on legal presumptions that arise from a child's circumstances. The Act provides that any person on behalf of a child may bring an action at any time to determine the existence of a parent and child relationship presumed under K.S.A. 2021 Supp. 23-2208. K.S.A. 2021 Supp. 23-2209.

2.

A presumption of parentage may be rebutted "by clear and convincing evidence," "by a court decree establishing paternity of the child by another man," or by another presumption. When a presumption is rebutted, "the party alleging the existence of a father and child relationship shall have the burden of going forward with the evidence." K.S.A. 2021 Supp. 23-2208(b). If two or more presumptions arise and conflict with each other, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control." K.S.A. 2021 Supp. 23-2208(c).

3.

The collateral order doctrine provides that an order may be collaterally appealable if it: (1) conclusively determines the disputed question; (2) resolves an important issue completely separated from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment.

4.

Anyone trying to establish a presumption of parentage by openly and notoriously claiming parentage must do so at the time of the child's birth.

5.

The Kansas Adoption and Relinquishment Act recognizes the primary importance natural parents have in a child's life, and adoptions will be granted with the consent of a parent, or both parents, or from those who are legally in the place of parents such as an adoption agency. The Adoption Act permits any adult to adopt a minor child, but only with the parents' consent. Consent to an adoption shall be given by the living parents of the child whose rights have not been terminated unless one of the parents' consent is found unnecessary under certain rules set out in the Adoption Act. K.S.A. 2021 Supp. 59-2113; K.S.A. 2021 Supp. 59-2129.

6.

The doctrine of res judicata is a common-law rule of equity hoping to promote justice and sound public policy. In other words, a party should not have to litigate the same action twice. Before the doctrine of res judicata will bar a successive suit, four elements must be met: (a) the same claim; (b) the same parties; (c) claims that were or could have been raised; and (d) a final judgment on the merits.

7.

The common-law doctrine of collateral estoppel, like res judicata, also bars someone from relitigating an issue determined against that party. Under Kansas law, collateral estoppel may be invoked when there is a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based on ultimate facts as disclosed by the pleadings and judgment; the parties must be the same or in privity; and the issue litigated must have been determined and necessary to support the judgment.

Appeal from Shawnee Court; MERYL D. WILSON, judge. Opinion filed September 9, 2022. Affirmed.

*Joseph W. Booth*, of Lenexa, for appellant D.A.

*Allan A. Hazlett*, of Topeka Family Law, of Topeka, for appellees C.A., D.P., and S.P.

*Linus L. Baker*, of Stilwell, for *amicus curiae* National Association for Grandparenting.

*Lindsee A. Acton* and *Warren H. Scherich III*, of Scherich Family Law, PC, of Shawnee, for *amicus curiae* National Association of Social Workers.

Before ATCHESON, P.J., HILL and GARDNER, JJ.

HILL, J.: Denied interested party status by the adoption court in his grandson's adoption, D.A. filed this Kansas Parentage Act action. In this case, Grandfather claims to be the "father" of E.A. due to his extensive history of fulfilling that role in the young boy's life. During those six years, E.A. has lived in Grandfather's home as Grandfather's son. Despite this history, the district court, relying on the adoption court's ruling, denied Grandfather's motion for summary judgment based on res judicata and collateral estoppel and dismissed the case. Grandfather appeals.

We agree with the district court that Grandfather is not entitled to summary judgment and with its dismissal of the case but for different reasons. In accordance with a recent Supreme Court ruling, we hold that Grandfather's claim of paternity fails because it is untimely. He did not claim paternity at the time of the boy's birth. He made the claim later. And, after considering the facts and the arguments, we conclude that a collateral attack upon an adoption proceeding should not be permitted in order to avoid inconsistent judgments of parentage from two courts. The resolution of such issues should be made in

3

the adoption case. We therefore affirm the district court's denial of summary judgment and dismissal of the case.

*A boy born out of wedlock moves in with his grandfather.*

E.A. was born in December 2012. When he was seven months old, E.A.'s natural parents could not care for him and Grandfather took physical custody of E.A. and agreed to integrate him into his family and to raise E.A. as his own child. Grandfather is the biological paternal grandfather of E.A.

A month later, Grandfather started and paid for a paternity action on behalf of E.A.'s natural father in Shawnee County District Court. In that action, the court determined the parents of E.A. to be J.B.—natural mother, and C.A.—natural father. The court awarded C.A. sole temporary custody of E.A. subject to supervised visitation by J.B.

Then, in January 2014, C.A. signed a "Custody Relinquishment" assigning and releasing custody of E.A. to Grandfather, the "paternal grandfather of such minor child." The relinquishment stated that Grandfather would be "solely responsible and entitled to make medical, educational, financial and any other type of decisions to effectuate the purpose of this agreement." This document was never filed with any court.

Over four years later, in August 2018, C.A. signed a "Consent to Adoption of Minor Child" agreeing to "permanently giv[e] up all custody and other parental rights" over E.A. and to the adoption of E.A. by Grandfather, "his paternal grandfather." This document was not filed with any court. By law, K.S.A. 59-2114(b)—the consent to adopt—expired after six months. Grandfather has never legally adopted E.A.

C.A. told Grandfather on August 1, 2018:

4

"Dad, this is your kid. Nobody will ever take him away from you while I am alive. Nobody that I know wants to. I don't want anyone else to know about this document other than you, uncle J[ ] and me. If I die and someone wants to take EJ from you, then you can use these documents to prove that he is your son."

The parties agree that from August 2013 to May 2019, E.A. lived continuously and exclusively with Grandfather's family. He lived as a full and equal member of Grandfather's family, which also consisted of a mother-figure and three brothers and sisters. He was raised just as his brothers and sisters. He believes that Grandfather is his father. He is widely known by friends, neighbors, teachers, and acquaintances as the youngest child of the family. And he is unaware of the existence of any other nuclear family members. Grandfather has provided a stable, fulfilling, and thriving childhood environment for E.A. Grandfather has notoriously—in writing, and by conduct—had a parent-child relationship with E.A. since E.A.'s infancy.

E.A.'s natural mother, J.B., accepted these arrangements over the course of E.A.'s life. During the past five years, she has had no contact with or provided any support to E.A. During the past five years, E.A.'s natural father has had minimal incidental contact with E.A.—as an older brother—not as a parent.

*Circumstances change.*

This arrangement abruptly changed in May 2019. Appellees S.P., E.A.'s biological paternal grandmother, and D.P., Grandmother's husband, asked for a visit with E.A. They picked up E.A. but have never returned him to Grandfather, and have prevented E.A. from having any contact with Grandfather and his family.

This appeal is, essentially, a legal struggle between Grandfather and his two opponents—Grandmother and D.P.

5

Grandmother and D.P. petitioned to adopt E.A. in Shawnee County District Court. Grandfather tried to intervene in the adoption proceeding, but the court denied his motion for lack of standing. The adoption court found that C.A.'s paternity of E.A. had been legally established in the prior paternity case, and that Grandfather did not meet the statutory definition of a "party in interest" in the adoption proceeding. We cannot tell from the scant record here if Grandfather tried to appeal the adoption court's ruling.

We do know that in response, Grandfather promptly petitioned for the determination of parentage under the Kansas Parentage Act, K.S.A. 2021 Supp. 23-2201 et seq., and the holding in *Frazier v. Goudschaal*, 296 Kan. 730, 295 P.3d 542 (2013). Grandfather filed the petition as "next friend" of E.A. He alleged he had "openly and notoriously in writing" acted as E.A.'s father. He asked the court to determine that he was a presumed parent of E.A. Therefore, he was entitled to a presumption of parentage under the Parentage Act. Grandmother and D.P. opposed the parentage action.

Both parties moved for summary judgment in the parentage case. The district court found that because Grandfather did not have standing in the adoption proceeding, he was prohibited from attacking the adoption because of the doctrines of collateral estoppel and res judicata. The court made three rulings:

- there could be no presumption of parentage here because parentage was established in the 2013 paternity case in which the court found that C.A. was the father of E.A.;

- parental rights cannot be terminated in a Parentage Act case; and

- a child cannot have more than two parents under the Parentage Act.

The district court dismissed the case.

6

Grandfather appeals that ruling. Besides his brief, two amicus briefs have been filed supporting his position. One is from the National Association for Grandparenting, which discusses the unique and important position that grandparents can and do play in children's lives. The second is from the National Association of Social Workers. The social workers stress that early attachments children have with parental figures play an important emotional role in that child's life.

*We are not bound by the district court's rulings.*

When we consider Grandfather's motion for summary judgment, we are in the same position as the district court. We apply the same rules and, when we find reasonable minds could differ on the conclusions drawn from the evidence, we will hold that summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo. See *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

*Grandfather did not notoriously or in writing claim parentage at the time of E.A.'s birth.*

Grandfather contends the uncontroverted facts found in his summary judgment motion show he is a presumptive father of E.A. because he notoriously and in writing acknowledged E.A. as his child. He claims respondents "are unable to rebut that presumption with any evidence, much less, clear and convincing evidence." He contends that E.A.'s natural parents exercised their parental preference by providing physical and legal custody to Grandfather and thus "have nothing to give to respondents in the adoption process." In other words, their consent to Grandmother's and D.P.'s adoption is without legal effect.

In opposition, Grandmother and D.P. contend that Grandfather's consent to adoption and custody documents are not proof of parentage and that he has no document showing J.B., E.A.'s birth mother, wanted him to have parental rights.

We begin with K.S.A. 2021 Supp. 23-2208(a)(4). It states that a man has a presumption of paternity if the man "notoriously or in writing recognizes paternity of the child." This is the law that Grandfather is relying on. He argues that through a series of agreements with E.A.'s birth parents and the acquiescence of J.B., he has replaced C.A. as father and has acknowledged that in writing. And this presumption cannot be rebutted.

We reject Grandfather's argument that his presumption of parentage cannot be rebutted. A presumption may be rebutted "by a court decree establishing paternity of the child by another man." K.S.A. 2021 Supp. 23-2208(b). There is a 2013 court decree establishing C.A. as the father of the child. And there is the adoption decree. Thus, Grandfather has the burden "of going forward with the evidence" if this court remanded the case. K.S.A. 2021 Supp. 23-2208(b).

On closer inspection, Grandfather's argument fails under the ruling in *In re Parentage of M.F.*, 312 Kan. 322, 352, 475 P.3d 642 (2020), in which our Supreme Court added a timing element to the "notoriously or in writing" recognition of paternity presumption. Neither party acknowledges this recent case.

*In re M.F.* involved a woman attempting to establish a presumption of maternity of a child conceived through artificial insemination under K.S.A. 2019 Supp. 23-2208(a)(4) after she split with the child's birth mother. Our Supreme Court held that the presumption stated in K.S.A. 2019 Supp. 23-2208(a)(4) does not allow a person to "unilaterally pursue parenthood." 312 Kan. at 351. The court recognized the parental preference doctrine and held the birth mother must have consented, implicitly or explicitly, to share parenting with the person claiming the presumption. The court further

8

held that the timing of the acknowledgment of the paternity/maternity was "critical." The court designated the time of the child's birth as when the birth mother must have consented to a shared parenting arrangement, and the person claiming the presumption must have notoriously recognized paternity/maternity of the child. 312 Kan. at 351-53.

When Grandfather became E.A.'s father in every meaningful way for the child, E.A. was at least seven months old when that arrangement began. Grandfather alleged, "On August 2013, at seven months of age, the natural parents of EJA became unable and/or unwilling to care for EJA." That is when Grandfather "took physical custody of EJA and agreed to integrate him into his family to raise him as his own."

But that was too late under the ruling in *In re M.F.* Moreover, in September 2013, Grandfather did not claim that E.A. was his own child. Rather, Grandfather "caused and funded" a court action so that C.A. would be legally named E.A.'s father. Later on, Grandfather and C.A. entered into written agreements pertaining to E.A.'s custody and C.A. told Grandfather that E.A. was Grandfather's son. But, at that point, Grandfather could not be E.A.'s legal parent without filing an adoption petition in a court—which he could have done but did not.

The general rule is that new opinions of the Supreme Court are binding on all other future cases and all cases still pending on appeal when the new opinions are filed. We thus hold that the ruling in *In re M.F.* applies here. The exceptions to the general rule are when:

(1) the new opinion establishes a new rule of law;
(2) retroactive application would not further the principle on which the new opinion is based; and
(3) retroactive application would cause substantial hardship or injustice.

*Stechschulte v. Jennings*, 297 Kan. 2, 18, 298 P.3d 1083 (2013).

9

None of those exceptions apply here.

To sum up, Grandfather has failed to persuade us that he is entitled to summary judgment on this claim of paternity.

From this specific concern we have about the timeliness of Grandfather's claim of paternity, we turn to a more general concern. Should collateral attacks upon adoptions be permitted? To answer this question we reviewed the Parentage Act, the Adoption Act, and several cases. We conclude that collateral attacks on adoptions are not permitted and the resolution of those parentage issues must be in one case so a common resolution of all claims can be achieved with appropriate appellate review to follow.

STANDING TO CLAIM PARENTAGE

Grandfather contends the district court erred in determining that this action was prohibited by principles of collateral estoppel and res judicata because:
>(1) he was not a party to the adoption proceeding;
>(2) he filed this action before the adoption was fully litigated; and
>(3) the adoption case is not final and all of the court's rulings in it are interlocutory.

To the contrary, he contends he had standing because he was a presumptive father and thus an interested party under the Parentage Act. Grandfather contends the Parentage Act can be used to terminate a presumed parent's prior exercise of parental rights when another person has a presumption founded on weightier considerations of policy and logic and it is in the best interests of the child. He cites *Frazier*, 296 Kan. 730, *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989), and *In re Marriage of Nelson*, 34 Kan. App. 2d 879, 882, 125 P.3d 1081 (2006).

10

In opposition, Grandmother and D.P. contend that Grandfather cannot indirectly appeal or collaterally attack the adoption using the Parentage Act. They cite *In re Adoption of T.M.M.H.*, 307 Kan. 902, 416 P.3d 999 (2018). They contend the termination of parental rights in the adoption proceeding had precedence over the parentage proceeding under K.S.A. 2021 Supp. 59-2136(d)(3). They contend Grandfather cannot attack the adoption because of the principles of collateral estoppel, res judicata, and law of the case. They contend there is no provision under the Parentage Act to terminate existing parental rights or to vest parental rights in a third person once the two parents have already been judicially determined.

In order to keep things straight, we offer one point of clarification. We are dealing with only one of two legal actions here—the lawsuit brought under the Parentage Act. We are not dealing with the adoption case. In fact, the record of the adoption case is not contained in this record even though the district court took judicial notice of the adoption case.

The district court in the adoption case ruled that Grandfather lacked standing as a party in interest. Whether that ruling is legally sound is not before us. The only standing issue here is whether Grandfather had standing to bring this Parentage Act action. He did.

*A review of two Acts provides a legal context for our ruling.*

THE KANSAS PARENTAGE ACT

This Act focuses mainly on parental relationships created by circumstance and not those created by blood. This law focuses on legal presumptions that arise from a child's circumstances. The Act provides that "*any person*" on behalf of a child may bring an action "[*a*]*t any time* to determine the existence of a father and child relationship

11

presumed under K.S.A. 2021 Supp. 23-2208." (Emphasis added.) K.S.A. 2021 Supp. 23-2209.

The Supreme Court has ruled that under K.S.A. 23-2208 some circumstances create a presumption that a man is the father of a child. A parental relationship may be legally established without the father being a biological or adoptive parent. See *Frazier*, 296 Kan. at 746; *Ross*, 245 Kan. at 594-602. Only one presumption requires a biological relationship to the child. Our Supreme Court has recognized these "legal fictions" of biological parenthood in limited circumstances. *In re M.F..*, 312 Kan. at 339. The presumptions include: the man's marriage to the child's mother, a court order requiring the man to support the child, and where the man "notoriously or in writing recognizes paternity of the child." K.S.A. 2021 Supp. 23-2208(a). A woman may also use the presumptions to establish a mother and child relationship, as was the case in *Frazier*. See K.S.A. 2021 Supp. 23-2220.

A presumption may be rebutted "by clear and convincing evidence," "by a court decree establishing paternity of the child by another man," or by another presumption. When a presumption is rebutted, "the party alleging the existence of a father and child relationship shall have the burden of going forward with the evidence." K.S.A. 2021 Supp. 23-2208(b). If two or more presumptions arise and conflict with each other, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control." K.S.A. 2021 Supp. 23-2208(c).

THE KANSAS ADOPTION AND RELINQUISHMENT ACT

Unlike the Parentage Act, the Kansas Adoption and Relinquishment Act begins with parental relationships created by blood. It recognizes the primary importance natural parents have in a child's life and adoptions will be granted with the consent of a parent, or

12

both parents, or from those who are legally in the place of parents such as an adoption agency. The Adoption Act permits any adult to adopt a minor child, but only with the parents' consent. Consent to an adoption shall be given by the living parents of the child whose rights have not been terminated unless one of the parents' consent is found unnecessary under certain rules set out in the Adoption Act. See K.SA. 2021 Supp. 59-2113; K.S.A. 2021 Supp. 59-2129.

The Adoption Act requires the court to consider "all evidence . . . offered by any party in interest." K.S.A. 2021 Supp. 59-2134(a). A party in interest in an adoption under K.S.A. 2021 Supp. 59-2112(h) is defined as:

"(1) A parent whose parental rights have not been terminated;

"(2) a prospective adoptive parent;

"(3) an adoptive parent;

"(4) a legal guardian of a child;

"(5) an agency having authority to consent to the adoption of a child;

"(6) the child sought to be adopted, if over 14 years of age and of sound intellect; or

"(7) an adult adoptee."

And finally, if a court grants an adoption, "the court shall enter a final decree of adoption, which terminates parental rights if not previously terminated." K.S.A. 2021 Supp. 59-2134(a).

*How the district court ruled*

When the district court denied Grandfather's motion for summary judgment, it simply ruled that he could not make his arguments because of the application of two doctrines:  collateral estoppel and res judicata. The judge did not give his reasons for

13

reaching that conclusion, nor did he provide any analysis about how these two doctrines apply here. Because similar arguments are being offered to us, a review of the fundamental requirements of the two doctrines is necessary.

The doctrine of res judicata is a common-law rule of equity hoping to promote justice and sound public policy. In other words, a party should not have to litigate the same action twice. But as the court in *Cain v. Jacox*, 302 Kan. 431, Syl. ¶ 2, 354 P.3d 1196 (2015), said, before the doctrine of res judicata will bar a successive suit, four elements must be met:  (a) the same claim; (b) the same parties; (c) claims that were or could have been raised; and (d) a final judgment on the merits.

Two of those requirements—the sameness of parties and finality of the judgment—may be lacking here. On the other hand, Grandfather tried to raise the same claim—that he was the presumptive parent of this boy in both cases—the adoption case and this parentage case. But when Grandfather tried to intervene in the adoption case, the adoption court closed the door to that attempt by holding that Grandfather was not a party in interest. If this is so, can res judicata apply to Grandfather since the court ruled he was *not* a party in interest? And as far as we can tell from our record, the adoption case orders are not final and are therefore interlocutory. Thus, the requirement of finality of the judgment may be wanting.

But there is another way to look at the facts. For a brief time, Grandfather was a party in the adoption proceeding. When he tried to present his claims of being E.A.'s parent and that claim was litigated by the adoption court, it exercised jurisdiction over him and his claims. At the same time, Grandmother and D.P., the adoption petitioners, opposed Grandfather's claims of parentage. The adoption court resolved the dispute and kicked Grandfather out of the adoption case. The parties were the same. The issues were the same. Grandfather then pursued this collateral attack on the adoption proceeding.

14

With this view of the facts, we could rule that res judicata did apply. But we need not go that far to resolve this question.

We do question whether the doctrine of collateral estoppel applies. That common law equitable doctrine, like res judicata, also bars someone from relitigating an issue determined against that party. Under Kansas law, collateral estoppel may be invoked when there is:

(1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based on ultimate facts as disclosed by the pleadings and judgment;

(2) the parties must be the same or in privity; and

(3) the issue litigated must have been determined and necessary to support the judgment.

See *Huelsman v. Kansas Dep't of Revenue,* 267 Kan. 456, 458, 980 P.2d 1022 (1999).

Again, we ask, since Grandfather is not a party in interest in the adoption case, can collateral estoppel apply? In addition, the adoption court's denial of Grandfather's attempt to enter Grandmother's and D.P.'s adoption case as a party in interest determined none of the rights and liabilities of the parties in the parentage case. Collateral estoppel does not seem to apply.

Unlike the district court in this Parentage Act case, we do not hold that the adoption court's ruling denying Grandfather party in interest status bars him from seeking a judicial determination of his parentage of this boy under the Parentage Act. But that determination should not take place in a separate case. We have other concerns that lead us to decide that a collateral attack on an adoption proceeding should not be permitted.

15

*We review the parties' arguments about applying the Parentage Act.*

The Parentage Act states that any person may bring an action "at any time" to determine the existence of a father and child relationship. K.S.A. 2021 Supp. 23-2209. The language "at any time" means there is no time restriction for filing the action. See *State v. Murdock*, 309 Kan. 585, 590-93, 439 P.3d 307 (2019) (interpreting K.S.A. 22-3504).

It also states that a parentage action "may be joined with an action for . . . adoption." K.S.A. 2021 Supp. 23-2210. In other words, the statute contemplates that an adoption action and parentage action may proceed at the same time given the interests involved and allows them to be joined without requiring the court to do so.

Grandmother and D.P. contend that the adoption proceeding has precedence over the parentage proceeding under K.S.A. 2021 Supp. 59-2136(d)(3). But that law has limited applicability. Subsection (a) of that statute states that "[t]he provisions of this section shall apply where a relinquishment or consent to an adoption has not been obtained from a parent and . . . the necessity of a parent's relinquishment or consent can be determined under this section." Subsection (d) identifies the procedure for terminating that parent's rights—the petition to terminate rights may be filed as part of a petition for adoption or an independent action. Subsection (d)(3) states:

> "Absent a finding of good cause by a court with jurisdiction under this act, a proceeding to terminate parental rights shall have precedence over any proceeding involving custody of the child under the Kansas family law code, K.S.A. 23-2101 et seq., . . . until a final order is entered on the termination issues or until further orders of the court."

But then subsection (h)(1) commands: "When a father or alleged father appears and claims parental rights, *the court shall determine parentage*, if necessary pursuant to the Kansas parentage act, K.S.A. 23-2201 et seq." (Emphasis added.) K.S.A. 2021 Supp. 59-

16

2136. That provision gives an alleged father standing in an adoption proceeding until a determination of parentage is made.

The statute Grandmother and D.P. cite—K.S.A. 2021 Supp. 59-2136—does not apply here. They did not petition to terminate Grandfather's alleged parental rights but sought the adoption of E.A. with the consent of C.A. and J.B., the birth parents. But even if it does apply, the statute requires the court to determine parentage when an alleged father appears and claims parental rights, as Grandfather did here. See K.S.A. 2021 Supp. 59-2136(h). A determination of parentage is required for the adoption to proceed. That said, obviously there cannot be two separate cases that will decide the same issue. That could lead to conflicting results—one court finding Grandfather was a parent and the other court finding he was not a parent. That possibility of conflicting rulings is our chief concern here.

*The problem of several people making parenting claims*

A situation involving multiple parentage proceedings arose in *In re Adoption of C.L.*, 308 Kan. 1268, 427 P.3d 951 (2018). That case did not involve the same issue as here, but it provides useful guidance. Prospective adoptive parents petitioned for adoption in Wyandotte County. Father, having just learned about the baby, petitioned to establish paternity in Shawnee County. Mother moved to stay the Shawnee County case. Father appeared in the Wyandotte County case and objected to the adoption. Unlike here, the Shawnee County court then stayed the paternity case, noting that Wyandotte County had achieved jurisdiction and ordered paternity testing. The court recognized the paternity determination in the Shawnee County case would have been duplicative of the paternity determination in the Wyandotte County case. 308 Kan. at 1270-72. Father's parental rights were terminated in the adoption proceeding.

17

On appeal, our Supreme Court criticized what it characterized as the appellees' "race to the courthouse" to initiate adoption proceedings to preempt Father's ability to establish his paternity. 308 Kan. at 1283. The court stated, "Termination of parental rights should not be determined by which side schemes to be shrewder or more strategic." 308 Kan. at 1285. We share a similar concern here. Did Grandmother and D.P. "race to the courthouse" and thus prevent Grandfather from presenting his claims of parentage in court?

Grandfather has a right to litigate his claim of parentage and should not be denied that right based solely on strategic maneuvering by Grandmother and D.P. But that right does not mean that Grandfather had the right to litigate the question of his parentage in two separate proceedings. Before we can elaborate on our concern, we must consider a recent Supreme Court decision.

In re Adoption of T.M.M.H. *must be considered in our analysis.*

A recent plurality decision from our Supreme Court involved a grandmother claiming to be a "parent" of her grandchild under the Parentage Act to contest the stepfather's petition to adopt the child. See *In re Adoption of T.M.M.H.*, 307 Kan. 902. There, Mother and Grandmother had an agreement that the child would live with Grandmother. Grandmother petitioned for grandparent visitation, which was litigated for several years. The court granted joint legal custody. After which, Stepfather petitioned for adoption. Mother consented to the adoption. Grandmother objected to the adoption. Stepfather responded that Grandmother was not an interested party in the adoption and therefore lacked standing. Grandmother contended she had standing because she was a permanent legal custodian or should be considered a coparent. Without hearing evidence, the court ruled Grandmother was not an interested party and lacked standing to participate in the case. Grandmother appealed and a panel of this court affirmed the district court. 307 Kan. at 904-06.

18

Grandmother argued to our Supreme Court that she should be considered a parent of the child. She asserted Mother had waived her parental preference and made Grandmother a coparent by agreement. She asserted she had been the child's primary caregiver for 90 percent of the child's life. The court found the record on appeal was insufficient to know "the exact contours of any of the agreements between Mother and Grandmother." Thus, Grandmother had not met her burden to establish that Mother "voluntarily and knowingly waived her parental preference." The Supreme Court plurality held that she had failed to establish a record sufficient to show she was a parent to meet the interested party requirement, meaning the court lacked jurisdiction over her appeal. The Supreme Court plurality ruled on procedural grounds only, taking no position on the merits of Grandmother's claim that she was a parent because of an agreement with Mother, finding the record was insufficient to do so. 307 Kan. at 910-20.

Justice Stegall concurred in the result because he believed *Frazier* was wrongly decided and Grandmother should not be considered a parent, but he stated that Justice Rosen's dissent "gets this case correct under current law" and that the plurality had wrongly heightened the standing requirement for alleged parents. 307 Kan. at 923-26 (Stegall, J., concurring).

In his dissent, Justice Rosen criticized the adoption court's refusal to appreciate that the grandparent visitation case "occurring under the same courthouse roof" impacted the adoption case. He also stated:

> "The majority validates this judicial dysfunction by affirming that a stepparent adoption under these circumstances is a procedural mechanism that can bar a person who achieves the status of parent, both in fact and in law, from even being heard before potentially being cut out of their child's life." 307 Kan. at 938 (Rosen, J., dissenting).

19

Justice Rosen concluded Grandmother had presented a prima facie basis for her standing as a parent and the district court should have conducted an evidentiary hearing to determine whether Grandmother could sustain her burden. 307 Kan. at 939 (Rosen, J., dissenting).

*Our conclusion is practical.*

One lesson that arises clearly from the rulings in *In re Adoption of C.L.* and *In re Adoption of T.M.M.H.* is that adoption courts should not ignore other pending cases that bring up the parentage of a child who is to be adopted. The separation of the adoption and paternity cases in the district court here has caused the same "judicial dysfunction" that Justice Rosen criticized. But like the grandmother in *In re Adoption of T.M.M.H.*, here, Grandfather could appeal the determination that he lacked standing in the adoption case because he claims to be a parent of E.A.

That said, we recognize that one way to read the holding in *T.M.M.H.* is that an order denying anyone interested party status in an adoption case is unappealable. The court stated:

> "To explain our conclusion that this court lacks jurisdiction, we return to K.S.A. 2016 Supp. 59-2401a, which defines 'interested party' by listing eight categories of individuals. One provision relates only to adoption cases; it specifies that 'interested party' means: 'The parent in a proceeding pursuant to' the KARA. K.S.A. 2016 Supp. 59-2401a(e)(1). But two general provisions apply as well. One general provision allows an appeal by 'the petitioner in the case on appeal' and the other by 'any other person granted interested party status by the court from which the appeal is being taken.' K.S.A. 2016 Supp. 59-2401a(e)(7), (8)." *In re Adoption of T.M.M.H.*, 307 Kan. at 910-11.

The question arises, then, if a movant does not fall into that interested party status and is not a petitioner, can that movant appeal? The court did not say no.

The Supreme Court noted that the Court of Appeals panel determined a final order was not involved in *T.M.M.H.* but the appeal could still be brought under the collateral order doctrine. Stepfather did not cross-petition for review of this finality of the judgment issue, and the court did not review it on its own motion.

The collateral order doctrine provides that an order may be collaterally appealable if it: "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment. [Citation omitted.]" *In re T.S.W.*, 294 Kan. 423, 434, 276 P.3d 133 (2012).

Whether a movant in an adoption case can appeal the rejection of their motion for interested party status affects our ruling here. If Grandfather can appeal the denial of his motion to be an interested party in Grandmother's and D.P.'s attempt to adopt E.A., then he cannot collaterally attack that adoption case in this parentage action for the reasons we will soon discuss. If Grandfather cannot appeal that denial decision, then he must be able to seek this collateral attack or he will be left with no way to obtain appellate review of the denial of his claim of parental rights.

We decline to read the tea leaves of a plurality Supreme Court decision. With no clear ruling by our Supreme Court that the denial of a claim of party in interest status in an adoption case cannot be appealed, we agree with the panel of our court in *T.M.M.H.* that such a denial is appealable under the collateral order doctrine. If it is appealable, then it follows that Grandfather should have appealed the denial of his party in interest status in the adoption case. This ruling prevents Grandfather obtaining an opposing ruling in a separate action.

21

Our reasons for this holding are practical. The problem we have with a collateral attack on an adoption case is the very real possibility of two courts rendering opposing rulings. How can such a problem be legally resolved? That is a legal dilemma that should be avoided. A child's legal parentage cannot be split.

The only reasonable way to resolve this dilemma is to consolidate the two cases into one so that all of the competing issues surrounding the parentage of a child can be determined properly. The proper case in which to decide these competing interests is the adoption case, for one simple reason. A court dealing with a Parentage Act case cannot grant an adoption. But an adoption court can resolve Parentage Act issues. Indeed, the Adoption Act recognizes that Parentage Act claims may have to be resolved before an adoption is granted. "When a father or alleged father appears and claims parental rights, the court shall determine parentage, if necessary pursuant to the Kansas parentage act." K.S.A. 2021 Supp. 59-2136(h)(1). The Parentage Act also recognizes that a parentage action may be joined with an adoption proceeding. See K.S.A. 23-2210(a).

While we do not agree with the district court's reasoning, the result is correct. If a district court reaches the correct result, its decision can be upheld even though it relied on the wrong ground or assigned erroneous reasons for its decision. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015).

*Any violation of the rule on summary judgment was harmless.*

Grandfather contends that Grandmother and D.P. did not comply with Supreme Court Rule 141 (2022 Kan. S. Ct. R. at 223). Their motion for summary judgment did not:
- address whether Grandfather had established a presumption of parentage (an issue of fact);
- state the material facts not in dispute with references to the record;

- articulate the applicable law; or

- present argument and authorities.

He argues that he controverted Grandmother's and D.P.'s contention that the adoption was final.

After examining the record closely, we hold this is a harmless error. A review of the law is helpful at this point.

> "A party against whom relief is sought may move, with or without supporting affidavits or supporting declarations pursuant to K.S.A. 53-601, and amendments thereto, for summary judgment on all or part of the claim." K.S.A. 2021 Supp. 60-256(b).

> "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." K.S.A. 2021 Supp. 60-256(c)(2).

Rule 141 states that the movant must list its uncontroverted facts in separate paragraphs with precise references to the record:

> "(a) A motion for summary judgment must be accompanied by a filing fee and a memorandum or brief that:
>   (1) states concisely, in separately numbered paragraphs, the uncontroverted contentions of fact on which the movant relies;
>   (2) for each fact, contains precise references to pages, lines and/or paragraphs—or to a time frame if an electronic recording—of the portion of the record on which the movant relies; and
>   (3) is filed and served on all counsel of record and unrepresented parties not in default for failure to appear." Supreme Court Rule 141(a) (2022 Kan. S. Ct. R. at 223-24).

23

"A motion for summary judgment may be heard only when the movant has complied with subsection (a)." Supreme Court Rule 141(f) (2022 Kan. S. Ct. R. at 224).

Our Supreme Court has cautioned that "Rule 141 is not just fluff—it means what it says and serves a necessary purpose." *McCullough v. Bethany Med. Ctr.*, 235 Kan. 732, 736, 683 P.2d 1258 (1984). But failure to comply with Rule 141 "may constitute harmless error if subsequent filings of findings of fact allow for proper presentation of the uncontroverted facts establishing summary judgment is proper." *Rhoten v. Dickson*, 290 Kan. 92, Syl. ¶ 2, 223 P.3d 786 (2010).

In *Rhoten*, our Supreme Court held the movants' failure to comply with Rule 141 was harmless where:

- the basis of the motion for summary judgment was issue or claim preclusion;
- there was a question of law that required a minimal number of uncontroverted facts to decide; and
- the movants later submitted findings of fact presenting the minimal number of uncontroverted facts required to establish their claim.

290 Kan. at 103.

Here, paragraph three of Grandmother's and D.P.'s motion for summary judgment stated:

"The District Judge in the adoption case has already determined that [Grandfather] lacks standing to contest the adoption. Further, subsequent to making that determination, after a full and complete hearing, the court dismissed all remaining contentions by [Grandfather]."

Grandmother and D.P. then argued that Grandfather's claim was barred by collateral estoppel and res judicata. After the motion hearing, Grandmother and D.P. submitted additional findings of fact and conclusions of law, though without citations to the record. They never contested Grandfather's statements of fact.

Grandmother's and D.P.'s failure to comply with Rule 141 was harmless error. It is not a reason to reverse the district court's holding. Minimal facts were needed to decide the legal question of issue preclusion. Grandmother and D.P. identified the ruling on standing by the adoption court. Grandfather's uncontested statements of fact provided the added context needed. But it is true that Grandmother and D.P. did not provide proof that the adoption court had ruled on Grandfather's motion to reconsider.

*Our holding*

We hold that Grandfather is not entitled to summary judgment and the district court was correct to dismiss the case because he has failed to show the timeliness of his "notoriously or in writing" acknowledgment of his paternity of E.A.

Turning to his claims of paternity, we are struck by the number of years that Grandfather has fulfilled the role of parent for E.A. and the suddenness of Grandmother's and D.P.'s taking the child, denying Grandfather access to the boy, and then quickly filing for adoption. We have no insight into the reasoning of the adoption court because of our very limited record. Had these facts been presented, would they have made any difference in the adoption court's ruling? We do not know.

But we do know that Grandfather had several years to adopt this child and did not. The consent to adopt that he had from E.A.'s father expired after six months. Given the facts here, the birth parents—the only two who could consent to an adoption—could have

25

consented to Grandfather's adoption of their son earlier. But the fact remains, they did consent to Grandmother's and D.P.'s desire to adopt.

We recognize that fact patterns similar to these will arise again, given the nature of human relationships. The only reasonable way to litigate these issues, given the nature of the Parentage Act and the Adoption and Relinquishment Act, is for them to be decided in the same action. We hold that the proper action must be brought under an adoption case.

We affirm the district court's denial of summary judgment and dismissal of the case.

\* \* \*

ATCHESON, J., concurring: I concur in the result the majority reaches here in finding that the Shawnee County District Court properly entered judgment against D.A. in this action in which he sought to be declared the father of E.A., his grandson, under the Kansas Parentage Act, K.S.A. 2021 Supp. 23-2201 et seq. I also agree the district court mistakenly used claim preclusion doctrines to do so. But Judge Hill's alternative reliance on *In re M.F.*, 312 Kan. 322, 352, 475 P.3d 642 (2020), probably unduly expands the holding of the case beyond its controlling facts to oust D.A. There are, however, two reasons grounded in the Parentage Act that D.A. fails. Either of those is sufficient to affirm the district court's judgment, if not its rationale.

Because this is a published decision, I feel some obligation to explain my thinking, so readers may survey for themselves the route I have taken. Some discursive observations to that end follow.

First, this case is a something of a procedural mess. As Judge Hill explains, D.A. filed this parentage action after his ex-wife and her husband filed an action to adopt E.A.

26

Because D.A. was not a named party in the adoption action, he sought to intervene, so he could counter their request to adopt E.A. with his arguments that he should be recognized as E.A.'s parent. His effort to intervene failed when the district court in that case determined he lacked standing. As far as the record on appeal in *this* case shows, the adoption action had not been concluded. We have only fragments of the record from the adoption case, stymying us in figuring out what exactly has gone on there.

Second, Kansas law governing the determination of parentage and who may be legally treated as the parent of a child has become labyrinthine. The Parentage Act, parts of which harken to much earlier times, has been augmented with court decisions ostensibly resting on contract law, constitutional doctrine, or other legal principles to afford rights and protections to partners in committed same-sex relationships, especially before same-sex civil marriages were recognized as a matter of right under the Fourteenth Amendment to the United States Constitution in *Obergefell v. Hodges*, 576 U.S. 644, 675-76, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015). Before *Obergefell*, same sex-couples could not marry in civil ceremonies in Kansas. Some couples endeavored to create intricate legal workarounds that would, to some extent, replicate the rights and obligations accompanying civil marriage, including parenting children born during the relationship. The Kansas Supreme Court has recognized at least some of those efforts. See *Frazier v. Goudschaal*, 296 Kan. 730, Syl. ¶ 13, 754-55, 295 P.3d 542 (2013).

The decision in *In re M.F.* is one of the more recent of those efforts. The court recognized that the biological mother of a child could effectively share her parental rights with her same-sex partner by so stating at the child's birth, if her partner "notoriously . . . recognize[d]" her own maternity at the same time—a process at least loosely consistent with the presumption of paternity outlined in K.S.A. 2021 Supp. 23-2208(a)(4). *In re M.F.*, 312 Kan. 322, Syl. ¶ 5. The court characterized its ruling that the Parentage Act countenanced such a result as a "legal fiction." 312 Kan. at 349. It is fictional in at least several ways.

The Parentage Act principally outlines mechanisms for determining the biological father of a child. The presumptions of "paternity" in K.S.A. 2021 Supp. 23-2208(a) are written that way, and the Parentage Act defines the relationship at issue as one between a child and his or her biological or adoptive father or mother. K.S.A. 2021 Supp. 23-2205. Almost as an add-on, the Parentage Act does recognize its provisions should be applied to women and efforts to determine maternity "[i]nsofar as practicable." K.S.A. 2021 Supp. 23-2220. But that is not really the same as permitting the mother of a child to share her maternal rights as a biological parent with a same-sex partner who obviously cannot be a biological parent.

Likewise, the statutory presumption of paternity based on notorious recognition of the child contains no time element or deadline for the recognition, let alone that it must be established contemporaneously with the birth of the child. Applying such a rule in all cases would undercut the broad purpose of the Parentage Act in establishing the identity of both biological parents of a child. Moreover, the rule would prevent a putative father who learns of the child only months or possibly years after the birth from being notoriously recognized as such, at least based on his own acknowledgments.[1]

[1] Notorious recognition of paternity is a legal doctrine of longstanding. It predates reliable genetic testing to prove paternity and rests on a commonsensical notion that a man typically would not acknowledge a child as his own or embrace community recognition of his paternity unless he had good reason to believe he had fathered the child. With the advances of science, paternity based on notorious recognition seems like a quaint relic. Genetic testing can establish paternity with near certainty—far more accurately than a conclusion necessarily derived from inconclusive circumstances, notwithstanding significant notoriety accorded the conclusion.

The surgically written holding and the concomitant rationale in *In re M.F.* strongly indicate the requirement that notorious recognition be contemporaneous with the birth of the child entails a common-law overlay to the statutory language in K.S.A. 2021 Supp. 23-2208(a)(4) confined to same-sex couples that include the biological mother. 312 Kan.

28

at 351-52. The treatment of the issue in the companion case of *In re W.L.*, 312 Kan. 367, Syl. ¶¶ 1, 5, 475 P.3d 338 (2020), seems to confirm as much.

The majority here cleaves those determinative facts from the rule in *In re M.F.* and then extends the rule to the demonstrably different facts here without explaining why that makes sense. The approach rests on doubtful judicial reasoning by analogy likely leading to an unwarranted expansion of the holding in *In re M.F.* I have elsewhere discussed the dangers of uncoupling essential facts from judicial holdings and applying the denuded rule as a governing legal principle across markedly different circumstances; I do not repeat that discussion here. See *State v. Pollman*, 56 Kan. App. 2d 1015, 1047-50, 441 P.3d 511 (Atcheson, J., dissenting), *rev. granted* 310 Kan. 1069 (2019), *dismissed as moot* March 23, 2021; *Brown v. Ryan*, No. 104,088, 2011 WL 6309451, at *7-8 (Kan. App. 2011) (unpublished opinion) (Atcheson, J., concurring).

Because D.A. has relied on the statutory presumption of paternity grounded in notorious recognition, the majority has broadly addressed how the presumption applies or (more precisely) doesn't apply to rescue his claim to be considered E.A.'s lawfully recognized father. I suppose we may fairly take on that task, although the district court did not directly do so, since it relied on preclusion rules in entering judgment against D.A. See *State v. Knight*, No. 105,092, 2012 WL 2325849, at *7 (Kan. App. 2012) (unpublished opinion) ("Appellate courts decide issues; they do not arbitrate or grade arguments."). Looking at that broad question, I see two reasons D.A.'s reliance on the presumption in K.S.A. 2021 Supp. 23-2208(a)(4) fails, and summary judgment, therefore, could have been properly entered against him.

First, the presumptions in K.S.A. 2021 Supp. 23-2208(a) set out predicate facts that trigger a presumption of a given man's biological paternity of a given child. Except for the presumption based on genetic testing, they do not depend on a direct link between the predicate fact and biological paternity. The Legislature, however, may craft rebuttable

29

presumptions of that sort in many circumstances. See *State v. Haremza*, 213 Kan. 201, 203-04, 515 P.2d 1217 (1973). The predicate facts for most of the presumptions rest on the marriage or the attempted marriage of a man and the child's biological mother. If the presumptive circumstances have been met, the child will be treated as conceived in that union absent evidence supporting another presumption in a second man.

Statutorily presumed paternity, if unrebutted, creates a legal obligation to financially support the child, blunting a common-law rule that a man had no duty to support offspring born outside of his marital relationship. See K.S.A. 2021 Supp. 23-2215(c) (after finding party to be parent of minor child, district court may enter appropriate support order); *Green v. Burch*, 164 Kan. 348, 353, 189 P.2d 892 (1948) (noting long discarded common-law rule that parents owed no duty of support to child born out-of-wedlock). Similarly, the finding of paternity establishes a right of the child to inherit from the judicially recognized parent. See K.S.A. 59-501. That, too, reverses a common-law prohibition on children born out-of-wedlock from inheriting. See *Smith v. Smith*, 105 Kan. 294, 299, 182 P. 538 (1919). The presumptions of paternity for a child born to a married couple or for a child notoriously recognized by a man have roots reaching deep into history to temper the common-law inequities, if not the social stigma, attached to children of unwed parents. They were developed without the benefit of modern genetic testing. And while the presumptions have a certain logic to them, they, of course, pale in comparison to the near conclusive link between DNA results and paternity or maternity. Those presumptions, however, have been carried on in the Parentage Act.

Of central importance here, under the Parentage Act, the predicate facts create a presumption of biological paternity. So in asserting the presumption based on notorious recognition, D.A. seeks to be judicially declared the biological father of E.A. But as everyone in this case knows—and the record amply demonstrates—D.A. is not E.A.'s natural father, and he has never claimed to be.

30

The presumption flowing from notorious recognition depends upon the man asserting it having a good faith belief he actually may be the child's biological father. Commonly, a man would not promote or even acquiesce in such recognition of himself absent a reasoned basis for believing his paternity. That's the legal and logical linkage of the predicate fact of notorious recognition to the presumed fact of biological fatherhood.

Without a good faith or honest belief requirement, an interloper could fairly assert paternity under the Parentage Act based on nothing more than his knowingly specious public representations of biological fatherhood. The Parentage Act should not be construed either to permit such claims or to require the courts to deal with them as facially appropriate. Treating those claims as legally colorable would so undercut the fundamental objective of the Parentage Act in determining the biological father of a child as to be an unreasonable construction of the Act. See *State v. James*, 301 Kan. 898, 903, 349 P.3d 457 (2015) (court should construe statute "to avoid unreasonable or absurd results"); *R.P. v. First Student, Inc.*, 62 Kan. App. 2d ___, 2022 WL 2377905, at \*2 (2022).[2]

[2] D.A. apparently chose to take in E.A. with the best of intentions. I do not read the record otherwise. Why the arrangement unraveled in 2019 is less than immediately obvious in this case. In other circumstances, a man might have various base motives for falsely encouraging notorious recognition of his parentage. For example, a child might show great promise even at a young age for a lucrative career as a professional athlete. Or, sadly, the child might stand to benefit financially from a catastrophic injury to himself or herself or to his or her maternal parent. That sort of scurrilous subterfuge likely would be undone at some point with a DNA test. See *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 59, 392 P.3d 68 (2017).

A man doing so would effectively promote a fraud generally and, in acting under K.S.A. 2021 Supp. 23-2208(a)(4), would invite the courts to unwittingly endorse the fraud by falsely finding him to be the biological father of the child. Courts need not and should not countenance such corrosive legal deceptions. See *Buchtella v. Stepanek*, 53 Kan. 373, 376, 36 P. 749 (1894) ("The courts never assist a party in the perpetration of

frauds."); cf. *Bouton v. Byers*, 50 Kan. App. 2d 34, 58, 321 P.3d 780 (2014) (courts may decline to enforce statute of frauds if result "would produce injustice"); *Emprise Bank v. Rumisek*, 42 Kan. App. 2d 498, 519, 215 P.3d 621 (2009) (court may disregard corporation form to hold officers liable when they use corporation to promote or shield fraud or injustice). In that circumstance, I suppose the biological mother of the child and possibly the true biological father would resist the claim of paternity. And I expect the district court would, then, ultimately deny the claim, after finding genetic testing to be in the child's best interests and acting on the results that would necessarily undermine the presumption of paternity based on notorious recognition. But where the evidence shows the claimant has no good-faith belief in his biological parentage, that extended exercise should be unnecessary.

Courts in other jurisdictions have recognized that comparable statutes legitimating children through notorious recognition of paternity or similar mechanisms should be construed to apply only to biological parents. See *Succession of Robinson*, 654 So. 2d 682, 684 (La. 1995); *State on Behalf of Hopkins v. Batt*, 253 Neb. 852, 864, 573 N.W.2d 425 (1998), *overruled on other grounds by State on Behalf of Miah S. v. Ian K.*, 306 Neb. 372, 378-79, 945 N.W.2d 178 (2020); *Mace v. Webb*, 614 P.2d 647, 648-49 (Utah 1980). But a biological stranger to a child may become a parent through statutorily recognized adoption proceedings. 614 P.2d at 649. The avenue of adopting E.A. was open to D.A., but for whatever reason he chose not to travel that route during the six years he had physical custody of his grandson. See Kansas Adoption and Relinquishment Act, K.S.A. 59-2111 et seq. D.A.'s misguided Parentage Act proceeding is not a legally fungible substitute for that lost opportunity.

All of that is enough to dispose of D.A.'s parentage claim, even on summary judgment, since he knows he is not E.A.'s biological father and, therefore, cannot invoke a legal presumption based on his false assertion of parentage to secure an order to that effect.

32

Apart from that deficiency, D.A.'s paternity claim fails as a matter of law on this record for another wholly independent reason. Assuming D.A. may properly assert the presumption for notorious recognition (an assumption I find unwarranted but indulge for purposes of disposing of this case), the presumption is rebuttable. Under K.S.A. 2021 Supp. 23-2208(b), a statutory presumption of paternity "may be rebutted . . . by a court decree establishing paternity of the child by another man." Here, the parties agree that in October 2013 the Shawnee County District Court filed a journal entry finding D.A.'s son to be E.A.'s "natural father." The 2013 journal entry comes within K.S.A. 2021 Supp. 23-2208(b) and rebuts the presumption upon which D.A. relies.

When a presumption of paternity has been rebutted, the party "alleging the existence of a father and child relationship"—here D.A.—has "the burden of going forward with the evidence." K.S.A. 2021 Supp. 23-2208(b). D.A., therefore, had the obligation to offer competent evidence, apart from the presumption of paternity based on notorious recognition, that he is the biological father of E.A. There could be no such evidence, given D.A.'s admission in his amended petition in this case that he is a blood relative of E.A. but not the child's "natural father." Documents appended to the amended petition further describe D.A. as E.A.'s paternal grandfather. Those factual representations in the petition and the attachments are admissions that may be used *against* D.A. on the cross-motions for summary judgment. See *Gray v. Freeman*, No. 112,248, 2015 WL 1125305, at *2 (Kan. App. 2015) (unpublished opinion) ("Although [a plaintiff] cannot rely on the petition to resist summary judgment, [a defendant] may properly treat the representations in the petition as admissions binding on [the plaintiff] for that purpose."); see also *Atlas Glass & Mirror, Inc. v. Tri-North Builders, Inc.*, 997 F.3d 367, 373 (1st Cir. 2021) (applying Federal Rules of Civil Procedure comparable to K.S.A. 60-256 and finding defendant may rely on factual representations in plaintiff's complaint as admissions supporting summary judgment); *Doe 2 by and through Doe 1 v. Fairfax County School Board*, 832 Fed. Appx. 802, 806 (4th Cir. 2020) (unpublished opinion).

33

D.A.'s indisputable inability to provide evidence he is E.A.'s biological parent or that he otherwise lawfully adopted E.A. dooms this Parentage Act claim. The district court would have been fully justified in entering summary judgment against D.A. on that basis. See *Oxy USA, Inc. v. Red Wing Oil, LLC*, 309 Kan. 1022, 1028, 442 P.3d 504 (2019).

For those reasons, I concur in the result we reach in affirming the district court's summary judgment against D.A. The latter portion of the majority opinion discusses how a Parentage Act claim might be joined with a separate action under the Kansas Adoption and Relinquishment Act in a single proceeding to avoid conflicting outcomes that would create both legal dissonance and practical complications of no small consequence. That's a laudable objective, but one that is not essential to how I would resolve this case. So I neither join in that discussion nor comment on it further.